# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| D.B., BY AND THROUGH | ) | |
| HER GUARDIAN, KATRINA WARR | ) | |
| AND KATRINA WARR, | ) | |
| INDIVIDUALLY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NUMBER:** |
| | ) | |
| MONTGOMERY COUNTY SCHOOL | ) | CV 2:07CV783 - MHT |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT

## I.    INTRODUCTION

This is an action for preliminary injunction and/or a temporary restraining order in accordance with the Individuals with Disabilities Education Act, ("IDEA") 20 U.S.C. § 1400, *et seq*., and the Alabama Exceptional Child Education Act, Ala. Code § 16-39-1 *et seq*., Plaintiff, Katrina Warr is the ~~adoptive parent and~~ legal guardian of D.B.  Plaintiffs bring this action to enjoin the District from restraining ("strapping in") D.B. to a "wedge," which is a device that defendant is inappropriately using as a mechanical restraint device.[1]  Defendant's restraint poses

---

[1] As will be explained, the "wedge" is actually designed for use by occupational therapists to assist with increasing a student's ability to bear weight in his or her upper body.



an immediate and serious threat of irreparable injury to D.B.

## II.  JURISDICTION

1.    This Court has jurisdiction in accordance with 20 U.S.C. § 1415(e)(4) and 42 U.S.C. § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391.

## III.  PARTIES

2.    Plaintiff Warr is the ~~adoptive parent~~ and legal guardian of D.B.  D.B. is a thirteen year old girl who has, *inter alia*, autism, seizures, a language disorder and mild mental retardation.  She is eligible for special education services from defendant under the classification of autism.  20 U.S.C. § 1402(3).

3.    Defendant, Montgomery County School District, is an entity subject to suit.  Defendant has an obligation to provide a free appropriate public education (FAPE) to D.B., to include the provision of services which are based on peer reviewed research.  Defendant also has the obligation to assure the provision of all due process procedures guaranteed by IDEA.  20 U.S.C. § 1413, *et seq.*

## IV.  FACTUAL ALLEGATIONS AND CAUSE OF ACTION

4.    Plaintiffs re-allege and incorporate by reference paragraphs 1-3 above with the same force and effect as if fully set out in specific detail herein below.

5.    D.B. is a thirteen year old special education student with the aforementioned disabilities.  D.B. currently attends Dalraida Elementary School.

2

She sometimes engages in inappropriate behavior due to her autism, but these difficulties are easy to remediate if done appropriately. (Decl. Sonja Lewis (Exh. A); Decl. Robert Babcock (Exh. B).

6.     IDEA is a Federal statute which entitles D.B. to comprehensive evaluations to identify her needs and a FAPE to meet her unique needs. 20 U.S.C. 1400 *et. seq.* IDEA provides federal financial assistance to school districts who implement its substantive and procedural requirements. Congress enacted IDEA based on its finding that the millions of children with disabilities had educational needs which were not being met due to, *inter alia*, inappropriate public school placements. 20 U.S.C. 1401.

7.     A FAPE is defined as "special educational related services which (A) have been provided at public expense, under public supervision and direction and without charge, (B) meet the standards of the state educational agency, including the requirements within the laws (C) include an appropriate preschool, elementary or secondary school education in the state involved and (D) are provided in conformity with an individualized education program (IEP)." 34 CFR 300.13. A student's IEP must be jointly designed by the district staff and the parents, who shall be equal participants in the education process. Students eligible for services under IDEA do not necessarily need to be served in "special education" classes.

3

Rather, many students receive appropriate services in regular classes based, *inter alia*, on IDEA's least restrictive mandate which requires that students be served in the least restrictive environment. 34 C.F.R. 300.114.

8.    IDEA recognizes that  many students have disabilities which cause them to display behavioral or emotional difficulties.  These students need progressive programs which are designed to teach the students how to control their behavior, rather than to rely on punishment.  Thus, IDEA imposes restrictions on the type of punishment that may be used on children whose disability causes their behavior problems. 34 C.F.R. 300.530, *et. seq.*[2]  Further, the definition of "education" is extremely broad.  It includes specially designed services to meet a child's and behavioral needs. 34 C.F.R. 300.39.  A student's educational program must be based on techniques which have been validated by peer reviewed research.

---

[2]*See, eg. Waukee Community School District*, 48 IDELR 26 (SEA Iowa 2007)(behavior intervention plan violated IDEA where implementation "not in a manner supported in the peer-reviewed research literature or consistent with prescribed practice" and adequate progress monitoring of interventions involving the use of physical force may have indicated their ineffectiveness for the child); Portland (ME) School District, 352 IDELR 492 (OCR 1987)(teacher's strapping a student in his wheelchair and then tying the chair to the radiator as part of a behavior intervention plan was not justified by any emergency situation and violated student's right to FAPE); *Cecil County Public Schools*, 107 LRP 22614 (Md Dept. of Ed. 2006)(even though staff were trained in use of physical restraint, hearing officer found that district violated state educational code by physically restraining student in circumstances not specifically outlined in students IEP. Additionally, school staff did not document use and subsequent failure of less intensive interventions before using the physical restraint.)

34 CFR 300.320(a)(4).

9.    One of IDEA's hallmarks is its procedural mechanism which was enacted to assure full and meaningful parental participation in all decisions regarding identifying, evaluating and designing a student's educational program. Congress provided parents with substantial due process rights so as to assure that they have meaningful input into their child's educational program, and so that a school district would not have any "natural advantage" in assuring the implementation of an IEP.  The procedural safeguards include, *inter alia*, the right to an impartial due process hearing if a parent "believes his or her that their rights or the rights of their children have been violated."  Ala. R. 290-8-9-.08(8); 34 CFR 300.507; 20 U.S.C. 1415.[3]

10.    Here, defendant has failed to provide D.B. with an appropriate program in that, *inter alia*, defendant has failed to provide D.B. with a program to appropriately address her autism and other disabilities. (Exhs. A and B).

11.    One of the major deficiencies in D.B.'s program is defendant's failure to provide D.B. with an appropriate behavior management program which is both

---

[3]Any party who is aggrieved by the decision of the impartial due process hearing officer is entitled to judicial review by a state or Federal court.  The reviewing court shall receive the administrative records, shall hear additional evidence at the request of either party and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.  20 U.S.C. 1415(i)(2).

based on positive behavior interventions, as required by IDEA, and validated by peer reviewed research. Rather, defendants are utilizing aversive behavior management techniques such as restraint, which subjects D.B. to serious and immediate danger of physical injury. (Exhs. A and B).

12. *Inter alia*, defendant restrains D.B. in a "wedge" when she allegedly displays inappropriate behavior.

13. The "wedge" is actually a device which is designed for use by an occupational therapist to increase a person's ability to bear weight on her upper extremities. The "wedge" is a blue vinyl covered triangularly shaped device which is made of firm foam rubber. It is approximately 20-24 inches wide and 4-5 feet long. The "wedge" has several velcro straps running down the length of the device. (Exh C., Hearing Transcript ("TR") 57-58). To appropriately use the wedge, a person should be positioned with her arms outside of the velcro straps and in front of her, in such a manner as the child can lean on her elbows or hands which are on the floor. In the event a child's elbows or hands cannot reach the floor, a small step is placed under them to allow the child to increase her strength. A child's arms are never to be restrained within the velcro. (Exh. A).

14. Restraining D.B. in a "wedge" is extremely dangerous. The district's use of the "wedge" as a mechanical restraint has never been approved by a

6

qualified behavior management specialist or by a physician. (TR 30). One of D.B.'s teachers who participates in the restraining of D.B., admits that she does not know how the "wedge" came to be used with D.B., or who recommended its use with D.B.

15.    District staff restrain D.B. by using several adults to force D.B. to lie on her stomach on the "wedge" while the staff strap D.B. to the device with the velcro straps, which run from D.B.'s shoulder to her feet.  Defendant straps D.B.'s arms down to her side within the velcro.  D.B.'s head then hangs over the highest edge of the device, which is approximately 12 to 18 inches off of the floor.  D.B. is typically in the wedge 10 to 15 minutes, but there is no data kept on the length of time she is in restraint.  (TR 40, 56-58).  Thus, for 10-15 minutes, D.B. must hold her head up and off the end of the device  while she if forced to helplessly  lie face down with her arms strapped to her side.[4]  This position is highly dangerous, especially given D.B.'s developmental disabilities and seizures.  D.B. also has low muscle tone and it would be very hard for her to hold her head in an upright position so that the weight of D.B.'s head does not push her neck in the front of the wedge.  (Exhs. A and B).

---

[4]To understand the restraint, the undersigned was strapped in it on August 27, 2007.  It is very hard to hold one's head up in this position.  However, such is necessary to avoid experiencing too much pressure on the front on a person's neck.

7

17.    District staff who help restrain D.B. have no training to mechanically restrain any child, including D.B. (TR 54, 120). For example, Elsie Keith, the principal of Dalraida, readily admits that she is not trained in restraint. She testified that she helps with the restrain by holding the D.B.'s feet. (TR 102-103). District staff use entirely subjective judgement regarding whether to restrain D.B. According to Ms. Galloway, D.B.'s current teacher, D.B. is forced into the "wedge" "when need be." (TR 40).[5] Other staff who helped restrain D.B. could not even explain how D.B. was restrained except to say that she (the staff person) "had an arm" and other staff "would probably have a leg or something." (TR 151-152). Some of the staff who strap D.B. into the wedge did not even know that D.B. has seizures. (TR 120).

18.    The use of the "wedge" as a mechanical restraint is not based on scientific or peer review research. (TR 32-33). Keith admitted that she has no evidence that D.B.'s program is peer review research based. (TR 93, 101). And, the risk of harming D.B. via restraint is real. In 2002, D.B.'s collarbone was broken when district staff physically restrained her.[6]

---

[5]During the 2006-07 school year, the district restrained D.B. to the wedge at least 4 times, with increasing frequency as the year progressed.

[6]District staff did not use a "wedge" when D.B.'s collar bone was broken. Defendant's accident report states that while D.B. was on the floor, staff "made the decision to maintain pressure on

8

19.    Consequently, on March 28, 2006, plaintiff requested a due process hearing under IDEA to challenge D.B.'s program. Michael Cole was appointed to serve as a hearing officer. Testimony has been taken over four non consecutive days and additional hearing days are scheduled though mid October 2007.

20.    D.B. has been evaluated by Dr. Caroline Gomez and Dr. Robert Babcock, two experts in autism and behavior management. Both experts also visited the school and reviewed D.B.'s educational records. (Exhs. A and B).

21.    According to Drs. Babcock and Gomez, as well as Sonja Lewis, D.B.'s occupational therapist, restraining D.B. to the wedge subjects her to a substantial risk of serious harm. (Exhs. A and B; TR 352-353). If D.B. is positioned so that her neck hangs over the edge of the "wedge" it would be very easy for D.B.'s larynx to get pressed down on the edge of the wedge simply from the weight of her head. Pressing down on a person's larynx may cause her to choke or aspirate or asphyxiate. Further, with her arms velcroed down to her sides, D.B. would have significant difficulty keeping her head up high enough to keep her larynx clear of the wedge's edge. This is especially true given that D.B. is physically forced into the wedge by untrained district staff and given that she has seizures. It is also significant that D.B. has overall low muscle tone. (Exhs. A and

_____

(D.B.'s) upper body." D.B. was eight years old.

9

B)

22.    According to both Drs. Babcock and Gomez, D.B.'s behavior problems are not significant and her education program is inappropriate to meet her needs. (TR 83). D.B.'s program was the worst Dr. Gomez has ever observed in the state of Alabama. (TR 300).  Both experts have stated that while, D.B. may occasionally display inappropriate behavior due to her disabilities, her behavior may be easily brought under control via the utilization of appropriate techniques, which do not include restraint.  Both experts believe that the wedge has absolutely no place in the continuum of interventions that might be a part of an appropriate behavior plan for D.B.  (TR 362).  Additionally, defendant's overreaction to D.B., including using the "wedge", instead of calming D.B., actually has the effect of exacerbating her behavior.  Both experts agreed that their concerns about the D.B.'s physical safety while in the wedge increased even further after learning that none of the staff who use the device had been trained to do so.  (Exh. B; TR 336).

23.    Defendant is aware of the serious safety concerns regarding the "wedge."  However, defendant still refuses to discontinue the use of the "wedge."

24.    Plaintiffs have also requested that the district stop using the wedge to restrain D.B.  Plaintiffs have also requested that district consult with an independent behavior management specialist who has a background in autism.  Defendant has

10

refused both of these requests.[7] D.B. is still subject to being restrained on the "wedge" and, thus, is subject to serious and immediate physical injury.

25.    At the hearing, plaintiff asked Hearing Officer Cole whether he believed he had the authority to issue an injunction to prohibit the use of the "wedge." Hearing Officer Cole indicated that he has no authority under IDEA to Order any preliminary injunctive relief. It is anticipated that Hearing Officer Cole will not render his administrative decision until, at least, November or December, 2007.

26.    In light of the forgoing, a Temporary Restraining Order and/or a Preliminary Injunction is necessary to prevent D.B. from a high risk of significant and irreparable harm.

27.    There is minimal, if any, prejudice to defendant by the issuance of Preliminary Injunctive Relief or a Temporary Restraining Order.

## IV.    **RELIEF**

**WHEREFORE**, plaintiffs respectfully pray that this Court grant the following relief:

---

[7]Recently, the parties have agreed to place D.B. in more regular education classes and to design a new behavior management program. However, defendant insists that it will use the wedge if it so chooses and it has refused to discontinue the use of the "wedge" until a new behavior program is developed.

11

1.    Entry of a Temporary Restraining Order and/or a Preliminary

Injunction, that the defendant cease and desist from utilizing the "wedge" as form

of restraint on D.B. until further of this Court.

2.    Award plaintiffs fees and costs for the time spent pursuing the instant

litigation, which was necessary to assure the safety of D.B.

3.    Award such other and further relief and benefits as the cause of justice

may require.

Respectfully submitted,


_Katrina Warr_
Katrina Warr
Plaintiff


_Rachel McGinley_                08/30/07
Deborah A. Mattison
Rachel L. McGinley
Attorneys for Plaintiffs


**OF COUNSEL:**
**WIGGINS, CHILDS, QUINN & PANTAZIS, LLC**
The Kress Building
301 19th St. N.
Birmingham, Alabama  35203
(205) 314-0500

State of Alabama
Montgomery County

12

**Verification**

I, the undersigned Katrina Warr, being first duly sworn, do hereby say:
I am a resident citizen of _____ County, in the State of Alabama. I
am the Plaintiff named in the foregoing Complaint. I have read the Complaint, and
the facts stated therein are true and correct to according to my information,
knowledge, and belief.

_Katrina Warr_
Katrina Warr

Sworn to and subscribed before me on
this the _30th_ day of _August_, 2007.

_____
Notary Public

**PLEASE SERVE DEFENDANT**
**AT THE FOLLOWING ADDRESS:**
Montgomery County Public Schools
1153 South Lawrence St.
Montgomery, AL 36104

13

# EXHIBIT
# A

## DECLARATION OF SONJA LEWIS

My name is Sonja Lewis and I reside in Montgomery, Alabama. I am a citizen of the United States and a resident of the State of Alabama. I am over the age of nineteen (19) and make this Declaration based on facts personally known to me. The following is true and correct to the best of my knowledge:

I am an occupational therapist. I am familiar with D.B. because I have both evaluated her and have provided occupational therapy since March of 2007.

I am aware that D.B. has autism, sensory issues, meaning that she can be extremely sensitive to physical touch and that she has mild mental retardation. D.B. also has seizures. While D.B. occasionally has some behavior difficulties, in my experience with her, her behavior difficulties are easy to remediate. I find it especially helpful to her to simply talk with her about what she perceives to be difficult situation, as D.B. is very verbal and can easily tell you what causes her frustration. However, it is my understanding that, based on conversations with D.B. and her mother, Ms. Katrina Warr, that the District relies on behavioral techniques which are inappropriate and potentially extremely dangerous for D.B.. Further, due to D.B.'s sensory issues, any type of mechanical restraint is contraindicated.

In particular, the District utilizes a "wedge" which is actually a device that is commonly used for the provision of occupational therapy. I am very familiar with the use of the wedge, given that I often use it, not for restraint, but to increase the weight bearing abilities of my clients. The wedge is particularly utilized to strengthen a person's back and neck muscles. The device is approximately four feet long and it has four to five velcro straps on it. The appropriate use of the wedge is to allow a person to be positioned in the wedge with their arms outside of the velcro straps and in front of them,

perhaps leaning on their elbows on the floor. In situations where a child may not have the range of motion to reach the floor, then a small step device is placed under the individual's hands or elbows to allow them to increase their strength. I know of no appropriate use, therapeutic or otherwise, which would include strapping a child into the wedge so that the child's arms are restrained to her side with her head hanging over the edge of the wedge. Further, such position would be highly dangerous, especially for someone like D.B., who has seizures, as well as other developmental disabilities. Further, D.B. has low muscle tone overall and it would be extremely difficult for her to hold her head in an upright position so that the front of her neck, due to the weight of her head, does not push into the edge of the wedge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _30_ day of _August_, 2007.

_Sonja Lewis, OTR/L_
SONJA LEWIS

# EXHIBIT
# B

## DECLARATION OF DR. ROBERT BABCOCK

My name is Dr. Robert Babcock and I reside in ~~Montgomery,~~ *Auburn* Alabama. I am a citizen of the

United States and a resident of the State of Alabama. I am over the age of nineteen (19) and make this

Declaration based on facts personally known to me. The following is true and correct to the best of my

knowledge:

I am a Licensed Psychologist and Board Certified Behavior Analyst. I have over twenty years

experience which includes clinical practice as well as academic teaching and research. From 2003-

2005 I served as the executive director for the Alabama Association for Behavior Analysis and

continue to be a member of that organization. I am also a member of the American Psychological

Association, the Association for Behavior Analysis, International, and the Autism Special Interest

Group, ABA International. Currently, I am the Coordinator of Psychological Outreach Services at the

Learning Tree and also maintain a private practice in Alabama. As part of my private practice I

contract with school systems across the state of Alabama to develop unique behavior intervention plans

to address the needs of specific students, including children with severe aggressive and self-injurious

behavior. I conduct professional development seminars and consult with teachers, school districts, and

parents concerning behavior analysis as it relates to children with special needs. I have served as an

expert consultant on transition and educational services in autism and on applied behavior analysis.

I have evaluated D.B., as well as the District's provision of an educational/behavioral program

to D.B. As part of my involvement in this case, I provided an assessment of the appropriateness of the

behavioral programming and maladaptive behavior related educational services provided to D.B. at her

elementary school. The behavior intervention plan used by the District, and especially the "wedge," is

extremely dangerous. It does not meet even minimal professional standards established by behavior analysts and its is not based on scientific or peer review research. In short, the program and the use of the wedge is not recognized by any legitimate behavior management principles.

I am very concerned about the procedure of restraining D.B. on a wedge. In my professional opinion, use of the wedge as a physical restraint creates a substantial risk of physical harm to D.B. The physical design and placement of D.B. in the wedge is very dangerous. The upper edge of the device is positioned at the child's larynx. Pressing down on a person's larynx may cause that person to choke. Because the child is in a leaning posture, it would be very easy for the larynx to get pressed down on the edge of the wedge simply from the weight of the child's head. Further, with her arms velcroed down to her sides or behind her back, a child would have significant difficulty keeping her head up high enough to keep her larynx clear of the wedge's dangerous edge. Any child, including D.B., that is placed in the wedge can be in an unrecognized and immediate risk of choking and/or asphyxiation and/or aspiration. This is especially true given that D.B. is physically forced into the wedge by untrained district staff, and given that D.B. has seizures.

Physical restraint should never be performed by untrained personnel. Furthermore, even with the use of appropriate restrictive measures (of which the wedge is not a part), punishment and/or restraint is justified only when true self injurious or aggressive behavior cannot be effectively treated due to the difficulty of completing an appropriate functional behavioral analysis. Based on my observations, D.B. does not engage in the type of behavior which cannot be managed without resorting to aversive conditioning. Further, the district has failed to complete a bona-fide functional behavior assessment.

The district's use of the restraint, as well as the application of the so-called behavior management plan is also inappropriate in that it relies on too much subjective judgment, coupled with

vague behavior rules.  The program, and especially the wedge, should be immediately and completely abandoned to avoid an immediate risk of substantial severe injury.

The combination of an unsafe device, lack of trained staff members, and lack of an appropriate behavior plan creates a situation that puts D.B. in immediate physical danger every time she enters the school building.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 24th day of August, 2007.

DR. ROBERT BABCOCK

# EXHIBIT
# C

IN RE THE MATTER OF

DEVONA BARBOUR

VERSUS

MONTGOMERY COUNTY BOARD OF EDUCATION

DUE PROCESS HEARING

CASE NUMBER: 06-36

HEARD IN THE ABOVE-STYLED CAUSE

ON THE 22nd DAY OF FEBRUARY, 2007

HEARD BEFORE HONORABLE MICHAEL COLE

HELD AT BELLINGER HILLS COMMUNITY CENTER

APPEARANCES:

FOR THE PETITIONER:

Hon. Deb Mattison

Attorney at Law

Birmingham, Alabama

FOR THE RESPONDENT:

Hon. Erika P. Tatum

Attorney at Law

Montgomery, Alabama

Page 30

1  Q   Okay.  And she has a helmet; is that correct?
2  A   Yes, ma'am.
3  Q   Do you know whether there was a prescription
4      written for the helmet?  Does the district have a
5      prescription to use the helmet?
6  A   I have no knowledge of who paid for the helmet or
7      who wrote the prescription.
8  Q   Or whether a prescription was written; correct?
9  A   All I know is she brought the helmet to school
10     with her one day.  I don't know how she got it.
11 Q   And the blue wedge?
12 A   Uh-huh.
13         MS. MATTISON:  Which we're going to ask
14         be produced.
15         THE HEARING OFFICER:  Uh-huh.
16 Q   The blue wedge, Devona has been restrained to the
17     wedge how many times last year?
18 A   Zero.
19 Q   How many times this year?
20 A   Twice.
21 Q   And does the district have a prescription to use
22     the wedge?
23 A   That, I don't know.

Page 31

1  Q   How many times last year was Devona not able to
2      eat lunch at the same time her class ate lunch?
3  A   I don't know.  I will have to refer back to the
4      point sheets.
5  Q   How many times this year?
6  A   I believe it was five.
7  Q   Is that on the point sheets?
8  A   It should be.
9  Q   And to be clear, who makes the decision when a
10     child doesn't eat lunch with the class?
11 A   I do.
12 Q   And as I understand the procedure, what happens is
13     if you decide -- Devona is in a classroom with six
14     children; is that right?
15 A   Yes, six other children.
16 Q   Six other children.  And they are all boys; is
17     that right?
18 A   No.
19 Q   There is another girl?
20 A   Yes.
21 Q   All right.  What about last year?
22 A   There were all boys.  I am not sure of the number,
23     because it changes throughout the year.

Page 32

1  Q   Devona ever sprayed in the face last year with
2      water?
3  A   No.
4  Q   How about this year?
5  A   No.
6  Q   The behavior management program, you have got a
7      behavior management program that applies to your
8      classroom; is that correct?
9  A   Yes.
10 Q   Did you write that program?
11 A   No, I didn't.
12 Q   Who wrote it?
13 A   You would have to check with someone else.  I
14     believe Mrs. Farquhar helped write it.  I don't
15     know exactly who came up with it.  I know it was
16     based on a program used in Florida.
17 Q   In Florida?
18 A   Yes.
19 Q   What program was it based on?
20 A   I'm not sure.  You would have to ask her.
21 Q   Do you know anything that the program was based on
22     at all, other than it was based on something in
23     Florida?

Page 33

1  A   No.
2  Q   You don't know of any research that supports the
3      use of that program, do you?
4  A   I can't recall the doctor's name that did the
5      research, but I do know that there was research
6      done.
7  Q   Uh-huh.  And what type of research was done?
8  A   I -- I don't know.
9  Q   Do you know what peer-reviewed research is?
10 A   Peer-reviewed research?
11 Q   Uh-huh.
12 A   No.
13 Q   And the program had been used for several years in
14     this school; is that correct?
15 A   I'm not sure.  I have only been there for two
16     years --
17 Q   Been used the entire time --
18 A   Yes -- so, I can't speak to that.
19 Q   All right.  Now, other than the daily point
20     sheets, and let me get copies of this.
21         MS. MATTISON:  I just got some stuff
22         last night about 5:30 --
23         I'm just going to show you

9 (Pages 30 to 33)

Page 38

1  A   Yes.
2  Q   Now, they are going to show me that Devona missed
3      her inclusion classes approximately on an average
4      of twice a week; am I correct, if I look at those?
5  A   I don't know.  I would have to look back at my
6      paperwork.  It would depend on how she was feeling
7      and whether or not she was able to go based on her
8      behavior.
9  Q   Well, it doesn't say in the IEP that her inclusion
10     classes are based on her behavior, does it?
11 A   No, it doesn't.  But if she is throwing a tantrum,
12     I don't think it would be wise to take her into a
13     classroom with 20 other kids, you know, and have
14     her have a tantrum.  I mean, that's just my
15     professional opinion.
16 Q   So, then if I chart, if I look at the times, if I
17     take her weekly inclusion reports and put it with
18     your point sheets, I'm going to see that on the
19     days that she didn't go to the inclusion class,
20     I'm going to see that she had a temper tantrum,
21     right?
22 A   You should.  However, each day that she went, her
23     daily inclusion notes may not have been signed.

Page 39

1      But you're more than welcome to talk with her
2      general education teachers to see the work that
3      she did do while there.
4  Q   Now, does Devona get to decide whether she goes to
5      inclusion or not?  She is a 11-year-old child.
6  A   Okay.
7  Q   Does she get to decide whether she goes to
8      inclusion or not?
9  A   This is --
10 Q   Yes or no?
11 A   -- how that works:  We ask her to come --
12 Q   First of all, yes or --
13         THE HEARING OFFICER:  What I will get
14            you to do is answer yes or no, and
15            then you can explain.
16 A   She --
17 Q   Does she decide, yes or no, whether she goes --
18 A   Her behavior --
19 Q   -- she follows her schedule?
20 A   Her behavior determines whether or not she goes.
21     If we say, Devona, let's go to social skills, and
22     she doesn't move, are we supposed to pick her up
23     and drag her down there, or --

Page 40

1  Q   Well, you have put her on the wedge, haven't you?
2  A   When need be.
3  Q   You have physically put her on the wedge, haven't
4      you?
5  A   Yes, I have.
6  Q   And she has been -- she has been -- the lunch --
7      let's go back to that.  The lunch situation when
8      she doesn't get her lunch, that's because --
9      that's basically a punishment because her behavior
10     was inappropriate or she didn't finish her work;
11     is that right?
12 A   She didn't attempt it.  When she doesn't attempt
13     it.  It's not about finishing her work.  If she
14     shows an effort, puts forth effort to complete,
15     you know, we do not delay the lunch.
16 Q   Okay.  But the question is still:  If her lunch is
17     delayed -- first of all, do you have anything from
18     a doctor that says that it's okay to delay her
19     lunch; that perhaps she might not, like the rest
20     of us, need to eat in order to be alert and do her
21     work?  Do you have anything at all from a doctor
22     that gives you permission to delay her lunch?
23 A   Not that I am aware of.

Page 41

1          THE HEARING OFFICER:  How much is the
2             delay, when you say delay the lunch?
3          THE WITNESS:  It can be from five
4             minutes up until two hours.
5  BY MS. MATTISON
6  Q   It can be until right before school is out, right?
7  A   Uh-huh.
8  Q   So, that would be three hours, wouldn't it?
9  A   No.  It would be --
10 Q   What time does school get out?
11 A   It would be 2:45.
12 Q   So, it would be two hours and 45 minutes --
13 A   Uh-huh.
14 Q   -- because lunch is 12:00 o'clock, right?
15 A   Uh-huh.
16 Q   You need to say yes.
17 A   Right.
18         THE HEARING OFFICER:  The Court Reporter
19            has to take down, so you will need
20            to verbally respond.
21         THE WITNESS:  Oh, sorry.
22 Q   And to be clear, the lunch delay, the withholding
23     of the food is because --

Page 54

1　decide -- based on whatever criteria you have --
2　when you decide they can eat, then they can eat;
3　is that right?
4　A　It's based on their compliance with the rules.
5　Q　Okay. All right. Now, tell me what training you
6　had specifically in terms of mechanical
7　restraints? What training have you had?
8　A　I have had none dealing with the wedge. But I
9　have had restraint training throughout the years.
10　And I actually have a card for it. Crisis
11　intervention restraint.
12　Q　But you have had no training on the wedge, right?
13　A　No.
14　Q　No, I'm correct?
15　A　Well, I was told how to use it by Mrs. Farquhar
16　and others that have used it, but --
17　Q　Well, I am not talking about --
18　A　-- to have certification in wedge training, wedge
19　restraint, I don't have it.
20　Q　Do you have any certification at all in use of
21　mechanical restraints?
22　A　No.
23　Q　And the training that you received -- I am

Page 55

1　assuming you received training in like a basket
2　hold?
3　A　Yes, several different --
4　Q　Several different physical manual, physical holds;
5　is that right?
6　A　Yes.
7　Q　That's the training that you received; is that
8　correct?
9　A　Yes.
10　Q　And, typically, I am assuming that you are
11　trained -- do you know who trained you for the
12　physical holding?
13　A　Yes. Jeff McClure, Sam Lawless, Connie Sawyer.
14　Q　Where are they from?
15　A　Jeff McClure and Sam Lawless were once employed by
16　Montgomery Public Schools --
17　Q　What's their background?
18　A　-- and so was Connie Sawyer.
19　Q　And what's --
20　A　All --
21　Q　What's their background?
22　A　They have all worked with children with behavior
23　problems.

Page 56

1　Q　Well, I mean --
2　A　And they have been sent to training. In order to
3　train us, they had to be sent to training.
4　Q　Uh-huh. And do you know where they got trained?
5　A　No.
6　Q　Okay. And they trained you, what, how to basket
7　hold and how to do a one-arm hold with a child?
8　A　And just crisis intervention before it gets to
9　that level.
10　Q　Did they train you on how to do the physical hold,
11　or did they train you how to do the crisis
12　intervention before it gets to that level?
13　A　Both.
14　Q　And do you keep data as to how long a child is
15　placed in the wedge?
16　A　Yes.
17　Q　Where is the data kept?
18　A　On the point sheets. I indicate whether or not
19　they have been placed in the wedge or not.
20　Q　Do you --
21　A　The amount of time, I don't believe that I do.
22　But it's the most is ten to 15 minutes.
23　Q　Uh-huh. And children have been physically held

Page 57

1　down and essentially kind of sat on by an adult
2　when they are in the wedge, haven't they?
3　A　Sat on?
4　Q　Well, I'm not going to suggest just sitting on
5　them, but essentially they have been held --
6　those -- the velcro straps -- children are
7　basically velcro strapped in with their arms down
8　to (indicating) -- well, why don't you explain it
9　to us?
10　A　Okay. They --
11　Q　Why don't you explain how the wedge -- what it
12　looks like? How big is it?
13　A　Maybe about 5 feet long. Maybe. I don't know.
14　Q　It's blue?
15　A　I don't know for sure. Yeah, it is blue.
16　Q　Okay.
17　A　The kids are down on the mat on their stomachs
18　with both arms to their side. And you have six or
19　seven straps that go from your shoulder to your
20　lower legs.
21　Q　Uh-huh. And you have to force the kids into that,
22　don't you?
23　A　Well --

15 (Pages 54 to 57)

Page 58

1  Q   You have to physically force the kids, including
2      Devona, into that; is that right?
3  A   I don't know whether force would be the word. But
4      you have to place them into the wedge.
5  Q   Well, we are not placing them in the wedge; we're
6      forcing them --
7  A   Putting --
8  Q   -- into the -- forcing --
9  A   Well, that's your term. And I choose to use
10     "place".
11 Q   Well, you have to use some force, don't you?
12 A   Huh?
13 Q   You have to use some force, don't you?
14 A   I have to use restraint tactics.
15 Q   Uh-huh. Mechanical restraint tactics. Withdraw.
16     And sometimes it takes a couple of adults to
17     get the kids into the wedge, doesn't it?
18 A   Yes.
19 Q   And sometimes it's taken more than one adult to
20     get Devona into the wedge, hasn't it?
21 A   Yes. She's taller than I am.
22 Q   All right. And if Mr. and Mrs. Barbour said, you
23     know what, I don't give you permission to use that

Page 59

1      wedge on my daughter no matter what, you can use a
2      physical basket hold on her; you can use a one-arm
3      restraint, you can hold her physically until she
4      calms down, but you don't get to tie her into that
5      wedge; they don't have that choice, do they?
6  A   Yes, they do. At any time that there is a problem
7      with the IEP or the program or --
8  Q   Okay.
9  A   -- whatsoever, all they have to do is voice their
10     opinion.
11 Q   Okay. So, that we're clear -- because maybe we
12     can settle this whole hearing right now -- it's
13     your testimony if my client says, you're not going
14     to use the wedge, and you're not going to delay
15     the lunch for my kid any more, that that's what
16     the school is willing to do?
17 A   I can't speak for what the school is willing to
18     do. I have people that are above me that make
19     those decisions.
20 Q   As I am looking at the IEP, it's not signed by
21     Mr. and Mrs. Warr, is it?
22 A   Right. The FBA is not signed. No, the --
23 Q   No?

Page 60

1  A   -- no, the behavior intervention program is not
2      signed.
3  Q   And do you realize that you don't have permission
4      in the parents to administer the behavior
5      management program?
6  A   I -- I know that they never said anything
7      objecting to it.
8  Q   Uh-huh.
9  A   I remember reading the IEP in the meeting. And on
10     each page, I specifically asked were there any
11     problems --
12 Q   Uh-huh. Why do you think --
13 A   -- they didn't say anything.
14 Q   Why do you think we're in this hearing?
15 A   Number -- there could be numbers of reasons. I
16     don't know.
17 Q   You don't have any idea?
18 A   I'm -- it's changed from year to year. So, I
19     don't.
20 Q   Were you aware --
21 A   Specifically, I don't.
22 Q   Were you aware that Devona's collar (sic) was
23     broken a couple of years ago?

Page 61

1          MR. TATUM: I'm going to object. That
2          was way before two years.
3          MS. MATTISON: I'm not raising it as an
4          issue for remedy. It goes to --
5          evidence can be raised. There may
6          not be relief for it.
7          THE HEARING OFFICER: Overrule the
8          objection.
9  BY MS. MATTISON:
10 Q   Are you aware that an aide broke her collar --
11     collar bone?
12 A   Yes.
13          MS. TATUM: Again, I object. This was
14          before --
15          MS. MATTISON: He overruled.
16          THE HEARING OFFICER: Overruled.
17          MS. TATUM: Okay. I'm sorry.
18 A   Yes, Devona told me that.
19 Q   Do you have a background in sensory impairment?
20 A   No, I don't.
21 Q   Okay. All right. My understanding, also, is that
22     Devona -- do you know whether Devona hit her head
23     in seclusion?

Page 82

```
 1         correct?
 2         THE WITNESS: Yes, I am.
 3         THE HEARING OFFICER: Ms. Mattison?
 4              DIRECT EXAMINATION
 5   BY MS. MATTISON
 6   Q   Good morning.
 7   A   Good morning.
 8   Q   Do you have a background in special education
 9       other than being a principal?
10   A   I was a psychometrist at one time.
11   Q   And how long ago was that?
12   A   It's been several years ago.  I can't remember the
13       exact date.  It was when my children were small,
14       and they are both grown.
15   Q   So, ten years ago or so?
16   A   Oh, it's more than that.  More than that.
17   Q   Are you aware that that a free, appropriate public
18       education must be based on special education or
19       related services, which are peer reviewed?
20   A   Yes, ma'am, I am.  I have been to several
21       trainings for special ed law.
22   Q   Can you tell me whether the program, behavior
23       management program, that is in place at Devona's
```

Page 83

```
 1       class -- how long have you been principal at the
 2       school?
 3   A   This is probably my 12th year, 11th or 12th.
 4   Q   Now, to clarify, Ms. Galloway has been a teacher
 5       there for two years; is that right?
 6   A   Correct.
 7   Q   And that classroom is actually -- that's not
 8       specifically for a classroom for kids with Autism;
 9       that is considered to be a classroom for kids with
10       behavioral problems; right?
11   A   Correct.
12   Q   And there is a Ms. -- I'm going to call her Ms.
13       Far, just because I'm terrible on names, and I
14       don't want to butcher her name.
15   A   Yes, because you messed up Devona.  It's Devona.
16       What did I say?
17   Q   Oh.  What did I say?
18         MS. TATUM: Divina.
19   A   Divina.
20   Q   I'm sorry.
 1   A   That's okay.  We all call her Ms. Far.  That will
 2       be fine.  Children call her Ms. Far, as well.
23   Q   I'm sorry.  I have actually another client by the
```

Page 84

```
 1       name of Divina.  I am thinking about Devona.
 2         MS. MATTISON:  And I apologize to you,
 3       also.
 4         MS. WARR:  Okay.
 5   Q   There is another classroom there that is a -- that
 6       is also a classroom for kids with behavioral
 7       disabilities; is that right?
 8   A   Well, one is primary, and one is intermediate.
 9       Same program.
10   Q   It's the same program; is that right?
11   A   Uh-huh.
12   Q   You need to say yes.
13   A   Yes, ma'am.
14   Q   Just because the Court Reporter can't take down --
15         THE WITNESS:  I'm sorry.
16         THE COURT REPORTER:  That's okay.
17   Q   And it is basically the same behavior management
18       program that's used in both classes; is that
19       right?
20   A   Well, it's individualized to each child's needs.
21       It's a program that's a blueprint for the
22       behavior.  But it's individualize for each child's
23       needs.
```

Page 85

```
 1   Q   Well, exactly how is it individualized for Devona?
 2   A   It's individualized through conferences that we
 3       have with the mother, IEP, the OT, the
 4       recommendations that we receive from the people
 5       who work with Devona.  We meet her needs through
 6       the testing analysis and recommendations from the
 7       committee as a whole.
 8   Q   Let's be specific.  Tell me how the behavior
 9       management program, how is it the content changed
10       for Devona.  Don't tell me --
11   A   I don't understand your question.
12   Q   All right.  Well, how is the program administered
13       to Devona any different than it is to the other
14       kids?
15   A   Well, for one thing, she uses a CD that she brings
16       with her --
17   Q   Okay.
18   A   -- that the other children do not use.  Everything
19       that we do with Devona, the helmet that was
20       prescribed for her when she has the situations
21       that she is head banging, is not used for other
22       children.
23   Q   Do the other kids bang their head?
```

1  A   No, ma'am.

2  Q   Now, did you all meet with the lawyer?

3  A   Yes, we did.

4  Q   And how many times did you meet with the lawyer

5      about this hearing or about Devona's program?

6  A   I think it was twice, but I could be mistaken.  I

7      think it was twice.

8  Q   Any phone conversations?

9  A   With the lawyer?

10 Q   Yeah.

11 A   No, ma'am.

12 Q   And who all was in the meetings with the lawyer?

13 A   Oh, gosh.  It was the teachers, Ms. Kirkland --

14 Q   Hold on.  Which teachers?

15 A   It was Ms. Farquhar, Ms. Galloway.

16 Q   Okay.  Okay.

17 A   I think Cindy Howicks, the OT, was there at one

18     time.  You know, to be absolutely honest, I can't

19     remember everyone that was there.  But it was a

20     large number of people who work --

21         MS. TATUM:  This lawyer, me, or Buddy

22         Scott?  Which lawyer are we talking

23         about?

1          MS. MATTISON:  Obviously, the school's

2          lawyer.

3          THE HEARING OFFICER:  Just state

4          everybody that you recall that was

5          in the meeting.

6  A   May I ask Ms. Kirkland to help me?

7  BY MS. MATTISON:

8  Q   Sure.

9          THE HEARING OFFICER:  No.  She will have

10         the opportunity to speak with

11         Ms. Kirkland later.

12 A   I think at one time Ms. Bradley, the speech

13     therapist, was there.  Cindy Howicks, the OT, was

14     there.  There was a classroom teacher who worked

15     with Devona was there.

16 Q   Who was that?

17 A   At the time, I think it was Ms. Fountain, Janice

18     Fountain.

19 Q   Is she a regular ed teacher?

20 A   Yes, she is.  Uh-huh.

21 Q   What does she teach?

22 A   She teaches the -- there is a three-way split, and

23     she has the social studies and the science.

1  Q   Okay.  Do you know whether -- has Devona ever been

2      removed from the regular education class, because

3      she has had a temper tantrum?

4  A   She has been removed from PE.

5  Q   That's a fairly stimulating environment; is it

6      not?

7  A   Correct.

8  Q   Has she ever been removed from social studies or

9      spelling, because she has had behavior problems in

10     those classes?

11 A   Not to my knowledge.

12 Q   She models behavior; does she not?

13 A   All children do, yes.

14 Q   Well, all children don't, do they?

15 A   All children model behavior, yes.

16 Q   All right.  And, technically, the class is

17     referred to as, what?  Is it called the

18     emotional --

19 A   The BIP Unit.  Behavior Intervention Program.

20 Q   Okay.  All right.  Do you know who designed the

21     program for the Behavior Intervention Program;

22     that being, behavior management program that's in

23     Plaintiff's Exhibit 5?

1  A   This program was in place when I became principal

2      at Dalraida School.  And as for a name that I can

3      give you, no, I do not.

4  Q   So, that program had been in place for over 12

5      years?

6  A   Yes, when I came to Dalraida as principal, I had

7      two behavior programs.  They were then called the

8      EC programs, which is the emotionally conflicted

9      program.  Of course, the terms have changed.

10 Q   And you don't have any evidence that the program

11     was based on any peer-reviewed research, do you?

12 A   No.  My evidence is on the success of the children

13     that we have served.  That's the only evidence I

14     have of that.

15 Q   Well, are you aware of what IDEA requires

16     regarding the provision of free, appropriate

17     public education based --

18 A   IDEA?

19 Q   Excuse me.  I'm sorry.  Mary is having a hard time

20     if you don't let me ask the question, first.

21         Are you aware that IDEA requires that the

22     special education services be based on

23     peer-reviewed research?

Page 98

1 that classroom. But she manages the children,
2 because she knows their needs better than a
3 substitute teacher.
4 Q  Here's the question. For example, today, there is
5 no substitute teacher in the classroom, is there?
6 A  I have the paraprofessional aides in the classroom
7 today to cover.
8 Q  There is no substitute teacher in the classroom?
9 A  Correct.
10 Q  And the aides are not licensed teachers, are they?
11 A  Correct.
12 Q  And, in fact, they could not sub for another
13 school? They are not qualified to be substitutes,
14 are they?
15 A  They are not employed as substitutes. They are
16 probably qualified, because they are all highly
17 qualified. They all have to be under No Child
18 Left Behind. So, yes and no.
19 Q  Tell me what training the aide -- Ms. Poole, let's
20 stick with Ms. Poole. What training,
21 specifically, has Ms. Poole had?
22 A  I do not know that --
23 Q  Okay.

Page 99

1 A  -- because Ms. Poole came to me from another
2 school.
3 Q  All right.
4 A  So, I don't know what her training was prior to
5 coming to Dalraida.
6 Q  Do you know whether she has a college education?
7 A  She is highly qualified, but she doesn't have a
8 college education.
9 Q  Is she certified as highly qualified?
10 A  Yes, ma'am.
11 Q  By whom?
12 A  Well, you have to be certified --
13 Q  By whom?
14 A  By whom? I guess it's the federal law that we
15 have to adhere to in Montgomery County.
16 Q  Who certified her as highly qualified?
17 THE HEARING OFFICER: In other words,
18 the state or county?
19 A  Mark Casias is the person.
20 THE COURT REPORTER: Who? I'm sorry?
21 THE WITNESS: Casias. He's Spanish.
22 C-A-S-I-A-S.
23 A  He manages the classified personnel. And he does

Page 100

1 all of the paperwork for certification. And he
2 gets all that from the State department who, in
3 turn, get it from the feds.
4 Q  Aides are not certified under highly qualified
5 categories?
6 A  I think I am misunderstanding "certified".
7 Q  Excuse me.
8 THE HEARING OFFICER: Let her finish the
9 question.
10 Q  Excuse me.
11 A  Okay.
12 Q  Is it your testimony that you have an aide who is
13 certified by anybody, who is actually certified as
14 highly qualified?
15 A  I don't know what you mean by "certified".
16 Q  Okay. If I look in Ms. Poole's employment file,
17 am I going to find anything that designates her
18 specifically as highly qualified?
19 A  She should have a letter in her file that was sent
20 to her from human resources.
21 Q  Is that human resources sent to her?
22 A  Uh-huh. Human resources is in charge of
23 certification or highly qualified status. When

Page 101

1 they are highly qualified, they send the paperwork
2 to us to put in their personnel file. So, it
3 should be in her personnel file.
4 Q  Now, I may have asked you this: And I think I
5 did, but I am not positive.
6 MS. MATTISON: Let me ask the Hearing
7 Officer whether I asked it. Did I
8 ask her when she knew whether the
9 program -- I know she said it was
10 there when it existed.
11 THE HEARING OFFICER: You didn't go into
12 any details about the program.
13 BY MS. MATTISON
14 Q  Can you state for certain -- I thought I asked you
15 this -- that the behavior management program in
16 Devona's class was based on peer-reviewed
17 literature?
18 A  You did ask me that. And the answer was no.
19 Q  And you said you didn't know, because it was
20 already there --
21 THE HEARING OFFICER: In place. You are
22 right.
23 A  It was in place. Okay. I'm glad I remembered.

Page 102

```
 1          THE WITNESS:  Don't put that on there.
 2          THE COURT REPORTER:  Sorry.
 3   Q   Have you ever assisted with restraining a child
 4       into the wedge?
 5   A   I am not certified in restraint.  I hold the feet
 6       to keep someone from being kicked.  I'm at the
 7       base of the restraining, I hold their feet.  And
 8       the persons who are trained to restrain do the
 9       retraining.
10   Q   You hold their feet?
11   A   Correct.  To keep them from kicking the teacher
12       and to hurt themselves.
13   Q   So, you lay hands on them?
14   A   I hold their feet, yes.
15   Q   Have you ever held Devona's feet?
16   A   Yes, ma'am.  I've held her hand, too.
17   Q   Did you say that there are staff in your school
18       who are certified to deliver mechanical -- there
19       is a difference between mechanical restraints and
20       nonmechanical restraints?
21   A   And I don't know what that's are.
22   Q   Is it fair to say, then, that you don't know
23       whether any of the staff in your school are
```

Page 103

```
 1       actually certified to administer mechanical
 2       restraints?
 3   A   Well, being that I don't know what mechanical
 4       restraints are, I assume the answer would be yes.
 5   Q   Now, do you know whether Ms. Poole has had any
 6       training regarding the administration of any type
 7       of restraint?
 8   A   No, I don't.
 9   Q   All right.  Have you reviewed the report by
10       Dr. Gomez?
11   A   No, ma'am.
12   Q   Is there a reason for that?
13   A   I have not seen the report.
14   Q   Do you know who Dr. Gomez is?
15   A   Oh, yes, her mother taught at my school.  I know
16       Carolyn Gomez quite well.
17   Q   She has an expertise in Autism?
18   A   I think so.
19   Q   In fact, the State has contracted with her to
20       train school districts around the state?
21   A   She has done inservices at my school.  She's very
22       good.
23   Q   And are you aware that she has recommended against
```

Page 104

```
 1       the use of the behavior management plan that
 2       Devona is on?
 3   A   Against the wedge or the plan in general?
 4   Q   Against both.
 5   A   I am not aware that she was against both, no.  I
 6       was aware that she didn't recommend the wedge.
 7   Q   Are you also aware that she did not recommend
 8       withholding food?
 9   A   No.  I have not read her report.
10   Q   Well, you may have learned it from somebody
11       else --
12   A   No, I am not aware of the delayed lunch
13       opposition, no.
14   Q   Okay.  It is true, is it not, that as further
15       punishment, children lose their ability to choose
16       certain items in lunch?
17   A   Yes, that's true.
18   Q   Uh-huh.  And, in fact, staff will do a food swap
19       for them, if you will?  The child loses their
20       ability to choose to eat something that they like;
21       and instead the staff will decide to replace that
22       with another food item?
23   A   Correct.
```

Page 105

```
 1   Q   Are you aware that Dr. Gomez recommends against
 2       that?
 3   A   Well, you just told me that.  Yes, I am.  I am
 4       aware of that.
 5   Q   You knew that you already knew that?
 6   A   No.  You told me that she was against it.  I told
 7       you I didn't know, because I hadn't read the
 8       report.  And you said, I think you could have
 9       heard it from someone else.  And I --
10          THE HEARING OFFICER:  Only from hearing
11          it from Ms. Mattison is what you're
12          saying?
13          THE WITNESS:  Right.  Correct.
14   Q   I will represent to you that one of the reasons
15       that Dr. Gomez recommends against that -- and
16       that's only one of them -- is because the staff
17       are not trained to make food choices, nutritional
18       food choices.  Can you tell me whether you know
19       for certain whether any of your staff have been
20       trained on food substitutions under that plan?
21   A   No, they have not.
22   Q   Have you read the occupational therapy report by
23       Sonja Lewis?
```

27 (Pages 102 to 105)

Page 118

1    It's a restraint that is where someone is strapped
2    to it. I mean, if I'm strapped to a chair, that's
3    a mechanical restraint. When a child is in the
4    wedge, the child is strapped in the wedge; is that
5    right?
6  A  Right.
7  Q  We've also heard testimony the staff will also
8    hold the child in the wedge in addition to
9    strapping the child in the wedge; is that true?
10  A  Repeat that.
11  Q  You have been part of getting kids, including
12    Devona, into the wedge?
13  A  Right.
14  Q  Is that right?
15  A  Right.
16  Q  And once Devona is in the wedge, she's just not
17    strapped in the wedge, and then everybody --
18    people have to hold her in the wedge even though
19    she is strapped in the wedge?
20  A  (Witness Indicating.)
21  Q  So, she is just strapped in the wedge?
22  A  No, ma'am.
23  Q  She doesn't get out. She is just strapped in

Page 119

1    there; is that right?
2  A  Once you put the straps on, then -- we -- it's no
3    holding. You are saying people -- that we hold
4    her, no.
5  Q  Okay. Have you held other kids?
6  A  Excuse me?
7  Q  Have you held other kids in the wedge?
8  A  Held?
9  Q  Uh-huh.
10  A  What do you mean by "held" them?
11  Q  Well, what do you think I mean by "held"?
12  A  I'm asking you.
13  Q  Well, manually lay hands on them.
14  A  Okay. I am not understanding your question.
15  Q  All right. Have you received any particular
16    training as to how to get Devona into the wedge?
17  A  I have received some training, yes, ma'am.
18  Q  Training as to how to get Devona into the wedge?
19  A  To get her into the wedge?
20  Q  Yes. How to restrain her into the wedge. Has
21    anyone trained you on than?
22  A  Uhm....
23  Q  Not talking about has someone just shown you how

Page 120

1    to do it; have you ever gone to a training on it?
2  A  I've came to training at Bellinger Hill.
3  Q  Well, have you ever been to a training on how to
4    strap a child into a wedge?
5  A  Uhm, let me recall. I can't -- I can't recall.
6    I --
7  Q  Okay. All right. Now, you are aware that Devona
8    has seizures; are you not?
9  A  No, I am not.
10  Q  You didn't know she had seizures?
11  A  No.
12  Q  Really? You didn't know she had partial seizures?
13  A  No.
14  Q  You are aware she bangs her head, right?
15  A  Yes.
16  Q  You don't remember her mother recently telling the
17    school that her seizures had increased? Nobody --
18    you have some responsibility for Devona; do you
19    not?
20  A  Yes.
21  Q  Did nobody ever tell you that her seizures had
22    increased recently?
23  A  I know nothing about seizures -- her seizures.

Page 121

1  Q  Devona hits her head, doesn't she?
2  A  Yes.
3  Q  And she hits her head when she is in the seclusion
4    room, right?
5  A  Right.
6  Q  And there is a helmet at school, right?
7  A  Right.
8  Q  But she won't put the helmet on, will she?
9  A  No.
10  Q  So, she just hits her head without the helmet,
11    because she won't put it on, right?
12  A  Well, she stops.
13  Q  Well, eventually, she stops, but she hits her head
14    without a helmet on; correct?
15  A  Correct.
16  Q  All right. And Devona's lunch was delayed this
17    week; was it not? She had her lunch late this
18    week, didn't she?
19  A  This week? No -- let me -- let me -- wait a
20    minute.
21  Q  You can go back to the week before that. Mom
22    tells me it was Tuesday. But let's just say
23    within the last couple of weeks, last two or three

Page 150

1      down what she heard that particular
2      child or some other child?
3      THE WITNESS: That particular child.
4      That child.
5      THE HEARING OFFICER: Thank you.
6  BY MS. MATTISON
7  Q  How long does it take Devona -- and then sometimes
8      does the teacher write it back on the wood, again,
9      and child has to rub it off?
10  A  No.
11  Q  How long does it take Devona to rub it off?
12  A  I don't know.
13  Q  Any opinion?
14  A  I don't know.
15  Q  The one time that you remember seeing Devona in
16      the wedge, how long was she in the wedge for?
17  A  Uhm, I can't recall, because once she
18      restrained -- she was restrained, I went next door
19      with the other kids to help with work -- help them
20      with their work.
21  Q  Why did you do that?
22  A  Why did I do that?
23  Q  Why did you go --

Page 151

1  A  Next door? Because Ms. Keith had came in,
2      assistant principal, would come in.
3  Q  Ms. Keith testified that even when Devona is
4      restrained that she held her feet; is that true?
5  A  That Ms. Keith held her feet?
6  Q  Yes.
7  A  I don't know.
8  Q  Well, you helped get her into the wedge, didn't
9      you?
10  A  Right. Right.
11  Q  What did you do to get her into the wedge?
12  A  What did I do?
13  Q  Uh-huh.
14  A  Uhm, I had -- okay. What do you mean, what did I
15      do?
16  Q  Well, what did you do? How did you help get her
17      into the wedge?
18  A  Oh, we -- I don't know. It --
19  Q  Well, explain what happened. What did you do?
20  A  I was on side of her -- well, two was on one side.
21      Someone else was on the other side. And we --
22  Q  Well, what? What did you do?
23  A  I can't explain it.

Page 152

1  Q  Well, you're going to have to try. What did you
2      do?
3  A  I can't explain it.
4      MS. MATTISON: Well, Hearing Officer.
5      THE HEARING OFFICER: Tell -- I mean,
6      tell what you did. Did you hold her
7      back?
8      THE WITNESS: No. I had an arm. I had
9      an arm.
10      THE HEARING OFFICER: And somebody else
11      had another arm?
12      THE WITNESS: Yes.
13      THE HEARING OFFICER: And how many
14      people -- would it take more than
15      two of you?
16      THE WITNESS: Yes.
17      THE HEARING OFFICER: How many would it
18      take?
19      THE WITNESS: Four -- about four.
20      THE HEARING OFFICER: And the other two,
21      what would they be doing?
22      THE WITNESS: They would probably have a
23      leg or something. I'm not --

Page 153

1  BY MS. MATTISON
2  Q  Devona doesn't like to be touched, does she?
3  A  To my knowledge, she don't.
4  Q  And you don't know how long she was in the wedge,
5      because you were in the other classroom?
6  A  Right.
7  Q  Roughly, how long were you in the other classroom?
8  A  Uhm, I -- I can't -- I can't say.
9  Q  Half an hour, hour?
10  A  I don't -- I don't know, because when I went over,
11      they -- they were asking about how to do the work.
12      And I was trying to help out with work.
13  Q  And to be clear, you were over in the other
14      classroom, because Ms. Farquhar was helping
15      restrain Devona, right?
16  A  Wait a minute. I didn't hear you.
17  Q  You went over to Ms. Farquhar's room, because
18      Ms. Farquhar was over in Devona's room helping
19      restrain Devona?
20  A  Right.
21  Q  And so, there needed to be another aide over to
22      help Ms. Farquhar's kids; is that right?
23  A  Yes.

Page 300

1  background designing programs for Devona?
2  A  Well, the reality is that children with Autism
3  really require specialized training. And I don't
4  necessarily mean that they would have to have
5  another specialized degree. But they would need
6  some outside training to be able to put a credible
7  program in place for a child with Autism.
8  Q  Did you see a credible program in place for
9  Devona?
10 A  I did not.
11 Q  Have you seen a worst program in place for a child
12 with Autism in the state of Alabama?
13 A  No.
14 Q  All right. So, Devona, you get there at 8:30, and
15 she is 30, 35 minutes?
16 A  Thirty-five minutes.
17 Q  All right.
18       MS. MATTISON: I don't believe that we
19       have a daily behavior sheet -- I
20       guess we do.
21       THE HEARING OFFICER: Sure. The
22       April 24th.
23

Page 301

1  BY MS. MATTISON
2  Q  There is something called Plaintiff's Exhibit 10
3  in front of you.
4  A  Oh, you're talking to me.
5  Q  Yeah, I'm sorry. I just wanted to show you that
6  this is the day that you were there. Was it the
7  24th?
8  A  Yes, April 24th.
9  Q  Now, I see that on April 24th, Devona, looks
10 like --
11 A  Wait a minute. That's February 24th.
12 Q  I'm sorry.
13 A  I just want to make sure I get to --
14 Q  Well, thank you.
15 A  I don't believe I have that date. Was it 3/24?
16 Q  No, 4/24.
17 A  Okay. There we go. Is that correct?
18 Q  Yes. All right. I see that on that date that
19 opening and breakfast, spelling and reading --
20 well, opening and breakfast, at least, she got all
21 pluses. Do you see that?
22 A  I do.
23 Q  Do you know why that would be when she ended up

Page 302

1  down in the principal's office?
2  A  No. That's the first time I have seen this. So,
3  I was just reading the comments.
4  Q  Oh, that -- all right. Okay.
5       Well, I'm going to read this out loud, and
6  tell me if I'm reading this correctly. This
7  morning during breakfast -- first of all -- I'm
8  sorry.
9       In your experience, is it typical, on a daily
10 progress report -- have you seen other children's
11 daily progress reports before?
12 A  Certainly.
13 Q  How typical is it to give academic points for
14 breakfast or opening breakfast or for lunch, for
15 that matter?
16 A  Not seen that before.
17 Q  Do you know what the difference is between the
18 social goal points and the appropriate classroom
19 behavior points?
20 A  Well, I asked about that. And at the top, a
21 social goal is listed: Staying on task. But I
22 did discuss with the teacher that that is not a
23 social goal.

Page 303

1  Q  Why isn't that a social goal?
2  A  That has to do with her following directions,
3  not -- social skills are more about how she would
4  interact with other people in her environment
5  appropriately.
6  Q  All right. Well, this -- we can read what this
7  says later. I'm not going to spend any more time
8  with that.
9       Tell us what happens when you go back into the
10 room 35 minutes later. What do you see? Describe
11 the classroom for us.
12 A  Okay. The classroom is quiet. It's a large
13 classroom, and the desks are spread out.
14 Q  What do you mean by spread out?
15 A  Not close to each other. At least this far
16 (indicating) apart.
17 Q  This far being --
18 A  From this table to this table.
19       THE HEARING OFFICER: For the Record
20       about how many feet would you
21       estimate that being?
22       THE WITNESS: Oh, five, four or
23       five feet.

Page 360

1  they don't force her to put it on, and she will
2  continue to bang her head sometimes.  Do you have
3  any concerns about the safety of that?
4  A  I've got concerns about just the head banging
5  itself.  I mean, I can't expect that she would be
6  instructed to put on a helmet when she is upset
7  and that she would do it.  I can't imagine that
8  she would do that.
9     So, the head banging, itself, is a huge
10  concern.  And we have to find a way -- we would
11  need to find a way to make sure that the head
12  banging was eliminated; that behavior was
13  eliminated.  So, there needs to be some serious
14  digging in on what's behind all of that.
15  Q  Does the fact that she has seizures cause you any
16  more concern about the head banging?
17  A  Certainly.
18  Q  About the safety of it?
19  A  Because it could be leading to the head banging.
20  Certainly.
21     And, you know, seizures typically in children
22  with Autism escalate around adolescence.  And
23  that's the timeframe we're looking at with her; is

Page 361

1  that correct?
2  Q  Yeah.  Okay.  On the 30th.  Another wedge day.
3  After PE -- although she got privilege that day,
4  too.  She got 24 points.  She didn't make her day,
5  but she got privileges.  After PE when -- PE class
6  was taken to the restroom break.  Devona leaned
7  against the wall.  Asked her what was wrong.  She
8  said she stepped on Chastity's foot.  Chastity
9  told her to get off her foot.  Said she was sorry.
10  It was over.  Going to go fast through it.  She
11  said she wouldn't go to class.  At the bottom of
12  that page.  Again, I tried to talk to her while
13  Ms. Poole escorted the rest of the class to the
14  room.  Ms. Farquhar came to help.  Devona said she
15  was still mad and wasn't going to class.  She
16  attempted to walk away from us.  And on the second
17  time, she ripped part of the tree that was in the
18  hallway.  Afterwards, she kicked us and stomped on
19  our feet several times.  She also scratched and
20  attempted to rip up -- rip my shirt.  After
21  several attempts to calm her down for safety
22  reasons -- after several attempts to calm her
23  down, for safety reasons, we had to secure her in

Page 362

1  the wedge.
2     Now, in your opinion, was that intervention
3  appropriate?
4  A  I don't think the wedge is appropriate, you know,
5  for any -- in any place in the intervention.  So,
6  you know, I don't know why I would speak
7  differently now.
8  Q  All right.  Fair enough.  Let me move on to
9  something else.
10     THE HEARING OFFICER:  Let me make sure I
11     understand.  So, you are saying the
12     use of the wedge is inappropriate
13     whether people who have been trained
14     in using it use it, or just it
15     itself --
16     THE WITNESS:  I believe -- I don't
17     think -- I believe it's
18     inappropriate and unnecessary.  But
19     I don't know of any specific
20     training or research that supports
21     the use of that.  So, unless I were
22     to see something, I couldn't speak
23     differently.

Page 363

1  A  I do think, again, that there are places within
2  this that behavior escalates and that we need to
3  be intervening by providing a distraction; giving
4  her if/then consequences.  I don't -- if these
5  thing are going on, they are not being documented.
6  And they may very well be going on.  But since
7  they are not documented, you know, we have to
8  assume that they are not going on.
9     So, we keep seeing this progression of
10  escalating behavior, but we don't see the steps
11  within that that should be affecting change.
12  Q  Okay.  And do we see that the Behavior
13  Intervention Plan is being implemented?  Any
14  documentation for that?
15  A  Not within this anecdotal information.
16  Q  Okay.
17     THE HEARING OFFICER:  When she is
18     banging her head -- and I know
19     you're saying you need to get to the
20     root of what's causing that -- but
21     if she won't put on her helmet, what
22     does the school do to protect her?
23     THE WITNESS:  Well, what I would

```
Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602000262
Cashier ID: khaynes
Transaction Date: 08/30/2007
Payer Name: WIGGINS CHILDS QUINN PANTAZIS
-----------------------------------
CIVIL FILING FEE
 For: WIGGINS CHILDS QUINN PANTAZIS
 Case/Party: D-ALM-2-07-CV-000783-001
 Amount:        $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 013036
 Amt Tendered:  $350.00
-----------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00

D.B. etc V. Montgomery County
School District
```